# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

ERIC THOMAS,

             Defendant.

Case No. 23-cr-1012-LTS

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## TABLE OF CONTENTS

Page

I.     *INTRODUCTION*................................................................... 2

II.   *THE SUPPRESSION HEARING* ......................................... 3

III.  *FINDINGS OF FACT*......................................................... 4

IV.  *DISCUSSION*....................................................................13

      *A.     Parties' Arguments* ...............................................13

      *B.     Relevant Law* ........................................................15

      *C.     Analysis*.................................................................21

V.    *CONCLUSION* ..................................................................32

# I.    INTRODUCTION

On April 19, 2023, the Grand Jury returned an Indictment, charging Defendant with one count of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(1), 922(g)(3), and 924(a)(8).  (Doc. 3.)

The matter before me is Defendant's motion to suppress.  (Doc. 22.)  The motion contained an inventory of items to be suppressed which includes Defendant's statements to law enforcement, a firearm, controlled substances, and any other evidence obtained as a result of a search of his home on January 23, 2022.  (*Id*. at 1-2.)  The Government timely filed a response.  (Doc. 27.)  The Honorable Leonard T. Strand, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on June 21, 2023.  (Doc. 31.)

The motion arises from law enforcement's search of Defendant's home and bedroom.

At the hearing, the following Government exhibits were admitted without objection:

1.  Search Warrant, filed at Doc. 27-2;

2.  Search Warrant, filed at Doc. 27-3;

3.  Aerial photo, filed at Doc. 27-4; and

4.  Video of interview with Defendant.

Defendant seeks to suppress the firearm, controlled substances, and other evidence (drug paraphernalia) seized during a search of his residence.  Defendant also seeks to suppress any statements to law enforcement.  (Doc. 22.)

At the hearing, the following defense exhibits were admitted without objection:

A.  Search Warrant, filed at Doc. 23;

B.  Traffic Cam Video; and

C.  Search Warrant, filed at Doc. 30.

2

The Government called two witnesses: Officer Brian Wullweber and Investigator Chad Leitzen. I found the witnesses credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.    THE SUPPRESSION HEARING

The gravamen of Defendant's motion is that a search warrant, Government Exhibit 1 (Doc. 27-2), for Defendant's person, residence, and associated property lacked probable cause.[1]  At the commencement of the suppression hearing, I confirmed that there was no allegation under *Franks v. Delaware,* 438 U.S. 154 (1978); *i.e.*, that Defendant was entitled to a hearing based on a substantial preliminary showing "that a false statement was knowingly and intentionally, or with the reckless disregard for the truth, included by an affiant in a search warrant affidavit. I also verified with the parties that neither contends that the issuing magistrate[2] relied on any information outside the "four corners" of the affidavit.

Nevertheless, the affidavit describes various locations in Dubuque, Iowa. I suggested that it was possible that a local magistrate would have a base-level understanding of the local geography that a judge sitting in Cedar Rapids would not and, therefore, the magistrate might have relied on this knowledge that is outside the affidavit. The Government then called two law enforcement officers involved in the investigation to introduce Government's Exhibit 3, an aerial photograph of the intersection of Hill Street and West 8th Street in Dubuque which depicts the area of Defendant's residence.

---

[1] A second warrant was issued that relied in large part on information obtained from execution of the initial warrant at the center of this dispute. (Doc. 27-3 at 6.) Defendant makes no arguments about the second warrant. However, it appears that the results of the second warrant are fruits of first warrant which should be suppressed if the Court declines to following my recommendation to deny the instant motion.

[2] "Magistrate" is the correct title for the judicial officer in question in this matter. *See* Iowa Code § 602.1101.

3

In the process of establishing the foundation for Exhibit 3, the Government called attention to a "minor discrepancy" in the affidavit regarding how a confidential informant described Defendant's residence, i.e., "near Hill street" versus "on Hill street." It also came to light that, in fact, the confidential informant had described the residence as being "near the bottom of Hill Street." Thus, the bulk of the hearing was occupied with explicating this discrepancy.

### III.    FINDINGS OF FACT

On January 23, 2023, Dubuque Police Officer Brian Wullweber[3] presented an application for a search warrant to an Iowa state court magistrate. Attached to the search warrant application was Officer Wullweber's affidavit. The search warrant application identified the following property and persons to be searched: Room 306 at the Days Inn in Dubuque, Iowa, Defendant's residence located on West 8th Street in Dubuque, a white 2015 Kia Sportage registered to Yolanda Demetris McDougal, and Defendant's person.

In the affidavit, Officer Wullweber recounted information provided by a confidential source[4] ("CS") to Dubuque Police Investigator Chad Leitzen.[5] Officer

---

[3] Officer Wullweber has been a police officer since 2002 and has been employed by the Dubuque Police Department since 2004. He is certified as a law enforcement officer by the Iowa Law Force Academy and attended the University of Illinois Police Training Institute in 2002. He is currently assigned as a dual-purpose narcotic canine handler.

[4] The CS's identity was not disclosed for the CS's safety and to allow the CS to be useful to law enforcement in the future. According to the Informant's Attachment, attached to the search warrant application, the CS was a mature individual, a person of truthful reputation, a person who lacked motivation to falsify information, a person who had supplied information in the past, including information used as the basis for a search warrant, information that led to two arrests, information that led to charges of possession of fentanyl with intent to deliver, possession of a firearm as a felon, and information that led to discovery and seizure of stolen property, drugs, and other contraband. Additionally, the CS had not given false information in the past. (Government Ex. 1 at 17.)

[5] Investigator Leitzen is employed by the Dubuque Police Department and is currently assigned as an investigator with the Dubuque Drug Task Force.

Wullweber prepared the affidavit, but Investigator Leitzen completed the "Informant's Attachment" to the affidavit because he had obtained the information from the confidential informant. The affidavit states:

(1) the CS had been obtaining heroin from Michael Vandermillen within the past month, who Investigator Leitzen knew to be Michael Henry Vandermillen, Jr.;

(2) the CS believed Saphire Lanhart was Vandermillen's wife (and Investigator Lietzen knew Saphire Ann-Marie Lanhart was married to Vandermillen);

(3) the CS identified a male subject named "E" as Vandermillen and Lanhart's source for heroin (and Investigator Leitzen knew E to be Defendant); and

(4) the CS stated that, according to Ms. Lanhart, even though Vandermillen had engaged in a controlled buy from E several years ago, E was still willing to sell heroin to Vandermillen and Lanhart. (Government Ex. 1 at 9.)

Officer Wullweber also recounted that, on January 16, 2023, he observed a white 2015 Kia Sportage parked at the Days Inn located on Dodge Street in Dubuque, Iowa. The vehicle was registered to Yolanda Demetris McDougal. Officer Wullweber stated that through prior work-related experiences, he knew McDougal was involved in both personal use and distribution of drugs.[6] (*Id.*)

In the affidavit, Officer Wullweber further recounted that, on January 19, 2023, Investigator Leitzen received information from a confidential informant[7] ("CI") regarding

---

[6] McDougal's criminal history includes convictions in Iowa state court for possession of a controlled substance in August 2007, controlled substance violations (three) in November 2010, and possession of a controlled substance (third offense) in October 2018. Additionally, McDougal has a conviction for possession of cannabis in June 2010 in Illinois state court.

[7] The CI's identity was not disclosed for the CI's safety and to allow the CI to be useful to law enforcement in the future. According to the Informant's Attachment, attached to the search warrant application, the CI had no motivation to falsify information and had supplied information in the past several times. The CI's past information had been used for a search warrant and led to three arrests. The CI's past information also led to the filing of the following charges: delivery

McDougal. The CI told Investigator Leitzen that the CI had been friends with McDougal for many years. The CI was aware that after being released from prison "a while back," McDougal went to a halfway house for several months. The CI stated that since McDougal was released from the halfway house, approximately five months ago, she started selling and using crack cocaine heavily again. The CI relayed the information about McDougal to Investigator Leitzen because the CI was concerned about the welfare of McDougal's 12-year-old child. Records confirmed that McDougal had a 12-year-old son. The CI reported that McDougal was staying at the Days Inn in Dubuque. The CI also stated that McDougal was dating a man who goes by "E," who Investigator Leitzen knew to be Defendant.[8] The CI stated that E lives "somewhere near Hill Street" in Dubuque.[9] The CI told Investigator Leitzen that E was selling heroin and regularly steals

---

of crack cocaine, delivery of powder cocaine, driving while barred, possession of crack cocaine, possession of marijuana, possession of drug paraphernalia, and person ineligible to carry a dangerous weapon. The past information provided by the CI also led to discovery and seizure of stolen property, drugs, and other contraband. Additionally, the CS had not given false information in the past. (Government Ex. 1 at 15.)

[8] Investigator Leitzen is familiar with "E," Defendant, from prior work-related experiences, including an undercover drug buy from Defendant. (Government Ex. 1 at 10.)

[9] Discrepancies regarding Defendant's suspected residence were the subject of testimony at the hearing. There were, in fact, two related discrepancies. Investigator Leitzen did not accurately describe what he heard from the CI about the residence and Officer Wullweber did not accurately describe what he learned from Investigator Leitzen. On the CI's Attachment to the search warrant application, prepared by Investigator Letizen, it states that "E," known to be Defendant, "lives somewhere on Hill Street." (Government Ex. 1 at 16.) Investigator Leitzen testified that the CI told him that Defendant lived "somewhere near the bottom of Hill Street." (Leitzen Hr'g Test. at 21.) Investigator Leitzen explained that "[t]he bottom of Hill Street would be the area of University and Hill or the next street to the south, would be Eighth and Hill, so that area depicted in the map, between Eighth Street and University on Hill Street is the end of Hill Street or the bottom of Hill Street." (*Id.*) *See* Government Ex. 3 (map showing Defendant's residence at the bottom of West 8th Street and Hill Street). Investigator Leitzen testified that Hill Street is about six blocks long. Investigator Leitzen stated that failing to put "at the bottom of" Hill Street in the CI Attachment was "obviously a misstep that should have been put in there, at the bottom of Hill Street. As far as why I did not put "bottom," just—I don't have a good answer

from several different stores around Dubuque.  The CI stated that E uses McDougal's vehicle for, among other things, selling drugs.  (*Id.* at 9-10.)

---

for it.  I should have said 'bottom' . . . what the CI said was 'somewhere at the bottom of Hill Street, and I put on there 'somewhere on Hill Street.'  It was clearly an omission, but it's not like I was changing the information about what [the CI] said."  (Leitzen Hr'g Test. at 31.)

At the hearing, Officer Wullweber addressed the discrepancy between the description in the CI's Attachment ("somewhere on Hill St.") and the search warrant application which states that "E" "lives somewhere near Hill Street."  (Government Ex. 1 at 10, 16.)  Thus, the warrant application contains three descriptions of where law enforcement or an informant believed that Defendant or "E" lived.  First, the affidavit describes Defendant as being "of" 554 West 8th Street Dubuque, Iowa.  The affidavit does not expressly state that law enforcement had concluded this was Defendant's address, but it is replete with references to Defendant's and his girlfriend's presence at this specific location.  Second, the search warrant application states the CI identified Defendant as residing "somewhere on Hill Street" as written by Investigator Leitzen in the Informant's Attachment.  Third, the body of Officer Wullweber's affidavit states the CI stated Defendant lived "somewhere near Hill Street."

While neither of the latter descriptions fully and accurately states what the CI actually told Investigator Leitzen (according to his testimony), Officer Wullweber's description captured, perhaps unintentionally, the gist of the CI's statement that Defendant resided "somewhere near the bottom Hill Street."  Given the relatively short length of Hill Street, both "somewhere near Hill Street" and "somewhere near the bottom of Hill Street" convey that the CI knew generally where Defendant lived but could not provide an exact address.  I note that the mistakes did not ultimately convey to the magistrate that the CI possessed more detailed knowledge of the address than the CI actually possessed.  Officer Wullweber stated that "[i]t was just a typographical error while completing the affidavit because they're in such close proximity to one another, meaning . . . West Eighth Street and Hill Street."  (Wullweber Hr'g Test. at 9.)  Further, Officer Wullweber stated that the discrepancy was not intentional, "[t]hat was just a typographical error while I was applying for the warrant.  My intention was not to change any—anything in the warrant application or to change anything that was stated on the CI attachment."  (*Id.* at 17.)

Ultimately the discrepancies, under these circumstances are, in fact, very minor. All of the descriptions of the CI's knowledge point to the same general vicinity and not a clearly erroneous location.  I further note that the affidavit does not appear to rely on the CI's statement to identify the place to be searched.  Had law enforcement relied on such a loose description for such a purpose, the error could have been much graver.  Rather, the CI's statement of the general vicinity of Defendant's residence appears to simply corroborate the CI's familiarity with Defendant.  Thus, at the end of this lengthy detour through the Hill Street neighborhood, I conclude that that the discrepancies are not the product of any intentional or reckless disregard for the facts.  Moreover, I conclude that the discrepancies are not significant to the magistrate's determination of probable cause.

7

Also, in the affidavit, Officer Wullweber states that, on January 19, 2023, he obtained written consent from Ronald Conrad, co-owner with his wife Cynthia Conrad of the Days Inn in Dubuque, to deploy his canine on hotel property. Additionally, Cynthia Conrad confirmed to Officer Wullweber that McDougal was currently staying in Room 306. Officer Wullweber deployed his canine outside the doors of Rooms 302 to 324, which are located on the exterior of the building and are visible and accessible to the public, for a free air narcotics sniff. Officer Wullweber's canine is certified to detect marijuana, cocaine, methamphetamine, heroin, fentanyl, and MDMA. Officer Wullweber's canine alerted on Room 306, McDougal's room. (*Id.* at 10-11.)

Officer Wullweber also set forth his review of Dubuque traffic cameras and his observations of McDougal's vehicle, the 2015 white Kia Sportage: (1) on January 19, 2023 at approximately 11:49 hours, the vehicle left the Days Inn and went directly to the residence on West 8th Street; (2) on January 19, 2023 at approximately 12:15 hours, the vehicle left the residence and went to a gas station located on Hill Street in Dubuque, where the vehicle pulled up to a gas pump and a female matching the description of McDougal exited the front passenger seat and went into the store, returning approximately five minutes later, and then returning directly to the residence on West 8th Street where McDougal was dropped off; (3) on January 19, 2023 at approximately 13:37 hours, the vehicle pulled into the Days Inn, and less than ten minutes later, the vehicle left the Days Inn and went directly to the residence on West 8th Street, where a male subject matching Defendant's description was observed exiting the driver's seat of the vehicle; (4) on January 19, 2023 at approximately 15:59 hours, the vehicle left the residence on West 8th Street and went directly to the Days Inn, and then, at approximately 16:09 hours, the vehicle returned to the residence on West 8th Street, where a child matching the approximate age of McDougal's son was observed getting out of the vehicle along with the driver who matched Defendant's description; and (5) on January 20, 2023

at approximately 10:37 hours, the vehicle left the Days Inn and drove to the apartment complex at the corner of Locust Street and 15th Street, where a subject exited the front passenger seat of the vehicle and went into the apartment complex, the vehicle left the apartment complex and traveled to the intersection of 24th Street and Windsor Avenue, parked on 24th Street and at approximately 11:01 hours, an unknown female subject walked up to the driver's window and conducted what appeared to be a hand-to-hand transaction with the driver and walked away, then at approximately 11:04 hours, an unknown male subject walked up to the driver's window, conducted what appeared to be a hand-to-hand transaction with the driver, and walked away, and then the vehicle left and traveled to the area of 9th Street and Jackson Street, parked at approximately 11:10 hours, and an unknown black male exited an apartment complex and conducted what appeared to be a hand-to-hand transaction through the passenger side of the vehicle, after which the vehicle then drove away. (*Id.* at 11-12.)

In the affidavit, Officer Wullweber stated that, on January 20, 2023, he applied for and was granted a search warrant for McDougal's person and her room at the Days Inn. Law enforcement executed the search warrant and found crack cocaine, marijuana, crack pipes, digital scales, packaging materials, plastic bags missing corners, numerous unused hypodermic needles/syringes, and numerous vials of Narcan. (*Id.* at 12.)

Also in the affidavit, Officer Wullweber discussed and incident surrounding a 911 call that dispatch received from Justin Woods on January 23, 2023. Justin Woods reported that his brother, Brian Woods, had been "dumped" out of a tan vehicle and was suffering a possible overdose. Ultimately, Brian was taken to the hospital and treated. A syringe containing liquid, an empty baggie corner, and a baggie corner containing a white powdery substance, which later tested positive for the presence of fentanyl, was found on Brian. In an interview with law enforcement, Justin Woods stated that he

9

observed Brian meet with a tan SUV at a gas station. Justin followed the SUV and saw Brian being "thrown" out of the vehicle and then called 911. (*Id.*)

Further, in the affidavit, Officer Wullweber outlined information gathered from the review of traffic cameras by a Dubuque Drug Force Task Officer, which showed the following: (1) At 11:21 hours, a gold-colored Jeep Cherokee pulled into a gas station followed by Justin Woods's vehicle; (2) the driver of the Jeep was believed to be Michael Vandermillen, Jr.; (3) both vehicles parked at gas pumps and Brian Woods exited Justin's vehicle and approached the Jeep; (4) Brian was observed at the passenger side door of the Jeep for a short time before briefly entering the gas station; (5) Brian returned to Justin's vehicle; (6) the Jeep pulled around to face Justin's vehicle and it appeared that Brian and the driver of the Jeep had a short conversation before the Jeep left; (7) at 11:32 hours the Jeep parked across the street from the residence on West 8th Street; (8) no stops were made by the Jeep between the gas station and the West 8th Street residence; (9) at 11:44 hours a black male subject matching the size and description of Defendant walked toward the Jeep, opened the passenger door, and briefly leaned into the vehicle; (10) approximately 30 seconds later, the black male subject, believed to be Defendant, walked away from the Jeep and back towards the residence; (11) shortly afterwards Defendant left in the white Kia Sportage, owned by McDougal and used by Defendant, and drove to the Days Inn parking lot; (12) following the meeting with Defendant, the Jeep drove to another gas station located near Hill Street; (13) Justin Woods's vehicle was parked at the gas station near Hill Street and traffic cameras showed that Justin's vehicle drove directly from the first gas station to the gas station near Hill Street; (14) once the Jeep arrived at the gas station near Hill Street, Brian Woods was observed getting into the Jeep; (15) the Jeep remained parked for several minutes before leaving at 11:56 hours; and (16) Justin followed the Jeep for approximately six minutes when the

events leading to Justin's 911 call occurred, namely Brian being "dumped" out of the Jeep. (*Id.* at 12-13.)

In the affidavit, Officer Wullweber states that:

Based on my training and experience, these circumstances are consistent with a drug deal where the driver of the Jeep, believed to be Michael Vandermillen Jr., is "middling" a drug deal between Brian Woods and the black male subject believed to be [Defendant]. It is believed that the meeting between Woods and the driver of the Jeep at the 32nd Street gas station was them arranging to make the purchase and possibly Woods providing money to the driver of the Jeep. The driver of the Jeep then meets with the drug supplier, believed to be [Defendant], to purchase the heroin for Woods. The driver of the Jeep then meets with Woods to deliver the heroin. It is then believed that Woods used heroin inside the Jeep and suffered an overdose.

(*Id.* at 13.)

Further, the affidavit provides that, at approximately 14:38 hours on January 23, 2023, Investigator Leitzen observed Defendant walking away from the door labeled Apartment 1 at the West 8th Street residence. Investigator Leitzen also observed Defendant enter the driver's seat of McDougal's vehicle, the white Kia Sportage. At approximately 16:37 hours on January 23, 2023, another Dubuque Drug Task Force Officer who was conducting surveillance on the West 8th Street residence, observed McDougal arrive in her vehicle and walk into the door labeled Apartment 1. (*Id.* at 13-14.)

Additionally, the affidavit provided that Investigator Leitzen had observed Defendant standing in front of the residence on West 8th Street on numerous occasions. Dubuque Police Department records showed that Defendant had been arrested on September 9, 2022 on an outstanding warrant. Defendant was searched incident to arrest and law enforcement found the following in Defendant's possession: three individual bags of heroin and drug paraphernalia, including nine syringes, a metal spoon, cotton filters,

11

and two rubber tourniquets. Law enforcement also found prescription medication for which Defendant did not have a prescription. Criminal history records for Defendant also showed that he had a conviction in Iowa state court for a controlled substance violation in 2014. (*Id.* at 10.)

In the affidavit, Officer Wullweber concluded that based on his experience and training, he was aware of the following:

a. Subjects involved in the distribution of narcotics commonly rent hotel rooms to conduct their sales. This is done to deflect the attention of frequent short-term visits away from their permanent residence.

b. The frequent short-term trips to and from one location to another in a vehicle is consistent with going to pick up a portion (instead of the bulk amount) of their narcotic supply and taking it to another location to sell. This is done so if they get caught, they do not lose their entire supply.

c. Subjects who are staying at a hotel or motel to conduct their narcotic sales often change rooms and stay at locations that are not highly visible to the public. This is done to deflect the attention of frequent short-term visits by customers.

d. Driving to different locations, parking, remaining in the vehicle, having people approach the vehicle on foot, conducting hand-to-hand transactions, and then driving away is consistent with the distribution of narcotics.

e. Subjects involved in the distribution of narcotics commonly keep the narcotics they are actively selling concealed on their person.

f. Digital scales commingled with plastic bags missing corners is indicative of the packaging of narcotics for distribution.

g. Narcan is used to reverse the side effects of opiates. Numerous vials of Narcan commingled with hypodermic needles/syringes is indicative of heroin use and distribution.

h. Subjects involved in the distribution of narcotics often keep their narcotics, scales, and packaging materials in secured or locked containers. This is done to protect their investment.

i. Drug transactions are almost exclusively a cash money transaction and people involved in the distribution of illegal drugs are known to keep proceeds from drug sales on their person, in their place of residence, or their vehicles.

(*Id.* at 14.)

At 6:27 p.m. on January 23, 2023, the magistrate approved and signed the search warrant. Also on January 23, 2023, at approximately 9:30 p.m. the search warrant was executed on Defendant's residence on West 8th Street. Law enforcement found 3.33 grams of suspected fentanyl, a loaded Ruger LCP .380 caliber pistol, packaging material, digital scales, drug paraphernalia, and a loaded syringe containing a brown-colored liquid. (*Id.* at 25-28.)

## IV. DISCUSSION

### A. Parties' Arguments

Defendant argues that "[t]he totality of the circumstances show that there was not probable cause for the affidavit of the search warrant authorizing the search of [the residence at] West 8th Street because there was a lack of showing that the property to be seized was tied to [Defendant's] residence." (Doc. 22-1 at 4.) Specifically, Defendant argues that information connecting him to individuals affiliated with drugs does not establish probable cause. (*Id.* at 5.) Defendant maintains that simply because he interacted with McDougal and drove her car "does not create a nexus between contraband and [his] apartment." (*Id.*) Thus, Defendant asserts that his relationship with McDougal does not support a finding of probable cause authorizing the search warrant. (*Id.*) Defendant also argues that "the affidavit's speculation that the events concerning Brian Woods on January 23[, 2023] demonstrates that [he] was involved in a drug deal does

13

not establish probable cause." (*Id.*) Specifically, Defendant contends that there "is no evidence on the traffic camera video that [he] exchanged drugs with the driver of the Jeep" and it "is not illegal to stop by someone's car window for a short time." (*Id.*) Defendant also notes that the traffic camera footage does not show him coming or going from the residence at West 8th Street and therefore no direct connection exists between the West 8th Street residence and the property to be seized, drugs and drug paraphernalia. (*Id.* at 6.) Defendant concludes that the affidavit for the search warrant fails to establish a sufficient nexus between drug distribution and his residence and lacks probable cause to authorize the search of his residence: (1) there is no evidence in the affidavit that "any activity" occurred at his residence; (2) the CI stated "E" resided on Hill Street not Defendant's residence on West 8th Street; and (3) the traffic camera footage does not show anyone coming to or going from Defendant's residence. (*Id.*)

Defendant also argues that the "anonymous complaint made against "E" had a relatively low degree of reliability." (*Id.*) Specifically, Defendant argues that the tip against "E" and McDougal "lacked any significant predictive information, especially related to [Defendant]." (*Id.* at 7.) Defendant also points out that "there was no indication that the tip was contemporaneous with the observation of criminal activity." (*Id.* at 8.)

Finally, Defendant argues that the *Leon* good faith exception does not apply in this case. (*Id.*) Defendant maintains that the search warrant for his residence was "obviously lacking." (*Id.* at 9.) Specifically, Defendant asserts that the affidavit in support of the search warrant application relied "almost solely" on information regarding his relationships with drug dealers, relied on a single drug conviction five years prior to the application for the search warrant, and much of the affidavit is speculative. (*Id.*) Thus, Defendant argues that the "*Leon* good faith exception should not apply because it was

unreasonable for the officer to rely on the [state] court's determination of probable cause." (*Id.* at 10.)

The Government argues that the search warrant was supported by probable cause. (Doc. 27-1 at 12.) The Government asserts that "there is a multitude of evidence that defendant was trafficking drugs independently from McDougal, and from his house." (*Id.* at 14.) The Government also asserts that events related to Brian Woods's overdose demonstrate probable cause, as Vandermillen, who was driving the Jeep that Woods overdosed in, met with Woods, then drove to Defendant's residence and parked outside and met with Defendant. After meeting with Vandermillen, Defendant entered McDougal's car and drove to the Days Inn. The Government maintains that "[t]here are sufficient links to establish probable cause that defendant was involved in a drug deal with Vandermillen, and that defendant had come from his residence." (*Id.* at 15.) The Government also argues that the confidential tips were reliable. (*Id.* at 16.)

Alternatively, the Government argues that "even if the . . . the search warrant lacked probable cause, the good faith exception applies." (*Id.* at 17.) Specifically, the Government asserts that it was objectively reasonable for law enforcement officers to rely upon the issuing magistrate's assessment and the officers' belief that probable cause existed was not entirely unreasonable. (*Id.* at 18-21.)

**B.     Relevant Law**

The Fourth Amendment to the United States Constitution provides that "no [search] Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)); *see also United States v.*

*Evans*, 4 F.4th 633, 636 (8th Cir. 2021) ("Probable cause is a fair probability that . . . evidence of a crime will be found in the location to be searched") (quoting *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996))). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted); *see also United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) ("In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause."). "The Fourth Amendment requires that the issuing 'magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Maccani*, 49 F.4th 1126, 1130 (8th Cir. 2022) (quoting *Gates*, 462 U.S. at 236); *see also United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017) ("The role of a reviewing court is to ensure the magistrate issuing the warrant 'had a "substantial basis for concluding that probable cause existed"'") (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016), in turn quoting *United States v. Garcia-Hernandez*, 682 F.3d 767, 771 (8th Cir. 2012))). "When the issuing magistrate relies solely on a supporting affidavit in determining probable cause, . . . 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Saddler*, 19 F.4th 1035, 1039 (8th Cir.

2021) (quoting *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020)). "The issuing court's probable cause determination 'should be paid great deference by reviewing courts.'" *Johnson*, 848 F.3d at 876 (quoting *United States v. Brewer*, 588 F.3d 1165, 1170 (8th Cir. 2009)).

The substantial basis standard requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). "[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). Conclusory statements, however, "made by affiants fail to give the issuing magistrate a substantial basis for determining probable cause exists." *United States v. Summage*, 481 F.3d 1075, 1077-78 (8th Cir. 2007). "In addition to probable cause that contraband or evidence of a crime will be found, 'there must [also] be evidence of a nexus between the contraband and the place to be searched.'" *United States v. Randle*, 39 F.4th 533, 536 (8th Cir. 2022) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). Defendant bears the burden of proving the warrant was issued without probable cause. *See Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence") (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)); *United States v. McGuire*, No. CR 13-40058, 2013 WL 5516192, at *3 (D.S.D.

17

Oct. 1, 2013) ("A movant seeking to suppress evidence under a regularly issued warrant has the burden to show that the warrant was issued without probable cause") (quoting *United States v. Sierra–Garcia,* 760 F. Supp. 252, 262 (E.D.N.Y. 1991)), *R. & R. adopted,* 2013 WL 6449893 (D.S.D. Dec. 10, 2013).  "In doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982) (quoting *United States v. Christenson*, 549 F.2d 53, 55 (8th Cir. 1977)); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.").

"When [an] affidavit is based on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search." *United States v. Oliver*, 950 F.3d 556, 564 (8th Cir. 2020 (alteration in original) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)).  However, "the determinative factor is not the source's history alone, '[t]he core question . . . is whether the information is reliable.'" *United States v. Evans*, 4 F.4th 633, 637 (8th Cir. 2021) (alteration in original) (quoting *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013)).  "Information may be sufficiently reliable to support a probable cause finding if . . . it is corroborated by independent evidence." *Keys*, 721 F.3d at 518 (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).  "If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Id*.  "[E]ven the corroboration of minor, innocent details can suffice to establish probable cause." *United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013)

(quoting *Solomon*, 432 F.3d at 828). Further, "[a]n informant's track record of providing trustworthy information establishes reliability." *Oliver*, 950 F.3d at 564 (quoting *United States v. Bradley*, 924 F.3d 476, 480 (8th Cir. 2019)).

The Eighth Circuit has held that, "[t]hough less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008). In *United States v. Nolen*, 536 F.3d 834 (8th Cir. 2008), the Eighth Circuit explained these distinctions further:

> [T]he Supreme Court has recognized a distinction between "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated," *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), and an anonymous informant, who cannot so easily be held responsible. *See also United States v. Kent*, 531 F.3d 642, 649 (8th Cir.2008) (asserting that a known informant "could be held accountable by [a] detective for [providing] false information"). This distinction is important, because although a tip received from a known informant will more readily support a finding of probable cause, a tip received from an anonymous informant requires "[s]omething more," usually in terms of independent police corroboration, before probable cause may arise. [*Illinois v.*] *Gates*, 462 U.S. [213,] 227, 241. . . .

> In addition to there being a distinction between known informants and anonymous informants, there is also an important distinction between the two types of known informants: reliable informants and unproven informants. Reliable informants are individuals who have "a track record of supplying reliable information" to law enforcement officers. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir.1993). Information supplied by such parties may be "sufficiently reliable to support a probable cause finding." *Id*. *See also United States v. Lucca*, 377 F.3d 927, 933 (8th Cir.2004) (asserting "[t]he information from a [confidential reliable informant] is sufficiently reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information."). Unproven informants are individuals without a track record of supplying information to law enforcement officers. "Though less reliable than

19

informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *Kent*, 531 F.3d at 649. Nevertheless, information supplied by such individuals "requires some independent verification to establish reliability." *Id.* (citing *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir.1995)). "Independent verification occurs when the information (or aspects of it) is corroborated by the independent observations of police officers." *Brown*, 49 F.3d at 1349.

*Nolen*, 536 F.3d at 839-40.

Additionally, under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4)

when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)) (emphasis in original).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted).

## C. *Analysis*

The magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant for Defendant's residence. Within the four-corners of the affidavit the following information provided a substantial basis for the magistrate to conclude there was a fair probability that contraband would be found at Defendant's residence and to find probable cause to issue the search warrant: (1) a CS told Investigator Leitzen that an individual identified as "E" (and known to Investigator Leitzen as Defendant) was Vandermillen's heroin supplier; (2) the CS also noted that even though Vandermillen participated in a controlled drug buy from Defendant several years ago, Defendant continued to sell drugs[10] to Vandermillen and Investigator Leitzen indicated he was familiar with Defendant from an undercover drug buy; (3) a CI told Investigator

---

[10] Paragraph 1(d) of the affidavit states the CS told law enforcement that Vandermillen and Lanhart "are getting it from some guy named 'E.'" (Doc. 27-2.) Paragraph 1(e) states "E" is "still willing to sell to Vandermillen and Lanhart." (*Id.*) These two paragraphs are most reasonably interpreted together to state that the CS believes "E" was willing to make such sales despite the prior controlled buy *and* that "E" was, in fact, making such sales.

Leitzen that Defendant, also identified as "E" by the CI, regularly sold heroin and lived somewhere near Hill Street[11]; (4) the CI also told Investigator Leitzen that Defendant was in a relationship with McDougal, a known drug user and drug dealer with a criminal history of multiple drug related convictions; (5) on January 19, 2023 and January 20, 2023, McDougal's vehicle, sometimes driven by Defendant, traveled multiple times between the Days Inn, where McDougal was living and where Officer Wullweber's canine alerted for drugs on an open air sniff outside the door to McDougal's hotel room, and Defendant's residence; (6) on September 9, 2022, Defendant was arrested on an outstanding warrant and was found in possession of three individual bags of heroin and drug paraphernalia in a search incident to his arrest; (7) Defendant's criminal history also included a conviction for a controlled substance violation in 2014; (8) on January 23, 2023, traffic cameras showed Vandermillen stopping outside Defendant's residence, an individual matching Defendant's description opening Vandermillen's car door, leaning into the car for 30 seconds and then walking back to Defendant's residence, which Officer Wullweber found these actions to be consistent with a drug deal; (9) after meeting with Defendant, Vandermillen immediately met Brian Woods and six minutes later Dubuque dispatch received a 911 call regarding Brian Woods overdosing on drugs; and (10) law enforcement officers observed Defendant on multiple occasions in front of, leaving, and/or entering the West 8th Street residence. Granting great deference to the issuing magistrate, *see Gates*, 462 U.S. at 236, and based on the totality of the circumstances presented to the magistrate in the affidavit, and considering the reasonable inferences drawn by the magistrate and the affiant, Officer Wullweber, *see Kail*, 804 F.2d at 444; *Brackett*, 846 F.3d at 992, I find that the magistrate properly determined that there was a fair probability that contraband would be found at Defendant's residence and the

---

[11] *See supra* note 8.

magistrate properly found probable cause to issue the search warrant. *See Maccani*, 49 F.4th at 1130.

Furthermore, I find a nexus existed between Defendant, drugs, and Defendant's residence. As discussed above, the affidavit contains information regarding Defendant's drug history (controlled buy involving Defendant in 2013, Defendant's drug conviction in 2014, and three baggies of heroin found on Defendant's person incident to arrest in September 2022), Defendant's relationship with McDougal, a known drug user and drug distributor who had drugs and drug paraphernalia in her room at the Days Inn which Defendant frequented and McDougal frequented Defendant's residence, a CS and a CI identifying Defendant as someone who sells heroin, and observation via traffic camera video of a drug deal between Defendant and Vandermillen outside Defendant's residence. Taken together, I find that the affidavit provided evidence of a nexus between Defendant, drugs, and Defendant's residence. *See Randle*, 39 F.4th at 536.

I also find that the CS and CI were reliable. In the search warrant application, the Informant's Attachment for the CS explained that the CS's identity was not disclosed for the CS's safety and to allow the CS to be useful to law enforcement in the future. According to the Informant's Attachment for the CS, the CS was a mature individual, a person of truthful reputation, a person who lacked motivation to falsify information, a person who had supplied information in the past, including information used as the basis for a search warrant, information that led to two arrests, information that led to charges of possession of fentanyl with intent to deliver, possession of a firearm as a felon, and information that led to discovery and seizure of stolen property, drugs, and other contraband. Also, according to the Informant's Attachment for the CS, the CS had not given false information in the past. (Government Ex. 1 at 17.) Similarly, the CI's identity was not disclosed for the CI's safety and to allow the CI to be useful to law enforcement in the future. According to the Informant's Attachment for the CI, the CI

23

had no motivation to falsify information and had supplied information in the past several times. The CI's previously supplied information had been used for a search warrant and led to three arrests. Information from the CI also led to the filing of the following charges: delivery of crack cocaine, delivery of powder cocaine, driving while barred, possession of crack cocaine, possession of marijuana, possession of drug paraphernalia, and person ineligible to carry a dangerous weapon. The information provided by the CI also led to discovery and seizure of stolen property, drugs, and other contraband. Additionally, the CS had not given false information in the past. (Government Ex. 1 at 15.) Here, both the CS and the CI had established track records of providing useful information. *See United States v. Oliver*, 950 F.3d 556, 564 (8th Cir. 2020) ("An informant's track record of providing trustworthy information establishes reliability.") (Quoting *United States v. Bradley*, 924 F.3d 476, 479 (8th Cir. 2019)).

Further, law enforcement corroborated information provided by the CS and CI. Investigator Leitzen knew the individual the CS identified as "E" to be Defendant and was aware of the controlled drug transaction involving Defendant and Vandermillen several years prior to the instant investigation. A records search corroborated the CI's discussion of McDougal's son by confirming that McDougal did have a son. Similarly, law enforcement confirmed with the owners of the Days Inn that McDougal was staying there. Law enforcement also observed Defendant driving McDougal's vehicle, confirming the CI's information about this issue. Moreover, like the CS, the individual identified as "E" was known to Investigator Leitzen to be Defendant. *See Keys*, 721 F.3d at 518 ("If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable."); *Rodriguez*, 711 F.3d at 936 ("[E]ven the corroboration of minor, innocent details can suffice to establish probable cause.") (Quoting *Solomon*, 432 F.3d

at 828)). Lastly, as discussed *supra ad nauseum*, the CI was able to generally identify the area Defendant resided.

To the extent Defendant relies on *Florida v. J.L.*, 529 U.S. 266 (2000) for the proposition that law enforcement failed to adequately corroborate the information provided by the caller, Defendant's reliance on *J.L.* is misplaced. Significantly, *J.L.* involved an anonymous tipster, not known and trustworthy informants who had supplied useful information in the past which led to arrests and a search warrant. Moreover, unlike *J.L.*, where the Supreme Court found that "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.," 529 U.S. at 271, here the affidavit relies on information from proven informants whose information was corroborated by law enforcement. Accordingly, I find that the CS and the CI were reliable sources and the information they provided supported the magistrate finding probable cause to issue the warrant.

Next, relying on *United States v. Lopez-Zuniga*, 909 F.3d 906 (8th Cir. 2018), Defendant argues that Defendant's interactions with McDougal do not support a finding of probable cause. Similarly, Defendant also argues that Defendant's interactions with Vandermillen on January 23, 2023 do not support a finding of probable cause. I am unpersuaded by Defendant's reliance on *Lopez-Zuniga* and his arguments associated with McDougal and Vandermillen.

In *Lopez-Zuniga*, a law enforcement officer applied for a warrant to place a GPS tracker on the defendant's vehicle. 909 F.3d at 908. The affidavit detailed law enforcement's investigation of an individual involved in drug dealing, including discussion of several controlled drug buys involving the individual. *Id*. As part of the affidavit, the officer stated that, "sometime before a controlled drug transaction at the apartment complex where [the individual under investigation] was believed to live, [the

officer] saw someone in [the defendant's] car 'drop off an individual who resembled [the individual under investigation].'" *Id*. at 908-09. The affidavit also provided that another officer "observed [the defendant] and [the individual under investigation] get into the same car at the same apartment complex and drive to a restaurant and mall[.]" *Id*. at 909. According to the officers, they "believed that [the defendant] and [the individual under investigation] were conspiring to sell illegal drugs and [the defendant] was transporting [the individual under investigation] for that purpose in the car." *Id*. Based on the foregoing, a state court issued a warrant for the GPS tracker. *Id*. The district court granted the defendant's motion to suppress evidence obtained from the GPS tracking device. *Id*. at 908. On appeal, the government abandoned its argument that the warrant was supported by probable cause and argued that "the good-faith exception saves evidence from the issuance of the . . . warrant from suppression." *Id*. at 909. The Eighth Circuit disagreed with the government, noting that the defendant "makes only a brief appearance in the affidavit . . . and the only information about him is that he dropped off someone appearing to be [the individual under investigation] at his apartment and then days later picked him up to go to a restaurant and a mall." *Id*. The Eighth Circuit also found that the affidavit did not connect the defendant to any of the individual under investigation's suspected criminal activities. *Id*. The Eighth Circuit held that, "if this amounts to probable cause, 'then anyone who drops a drug trafficker off at the trafficker's residence and travels with the trafficker for innocent activity . . . would be subject to search." *Id*. at 909-10. The Eighth Circuit determined that "the warrant was so lacking in indicia of probable cause that belief in its existence would have been entirely unreasonable." *Id*. at 910.

The present case is distinguishable from *Lopez-Zuniga*. First, the *Lopez-Zuniga* defendant and the individual under investigation had only two interactions: dropping the individual under investigation off at his apartment and picking him up and going to a

restaurant. Here, Defendant and McDougal were in a dating relationship and the affidavit discusses multiple interactions between Defendant and McDougal driving McDougal's car between the Days Inn and Defendant's apartment. Second, both Defendant and McDougal were known to law enforcement as drug distributors, and both had criminal drug convictions. Third, in addition to his interactions with McDougal, law enforcement had conducted a controlled drug purchase in the past with Defendant and in September 2022 Defendant was found with three bags of heroin and drug paraphernalia when searched incident to arrest. Fourth, the affidavit contained information regarding a drug transaction between Defendant and Vandrmillen on January 23, 2023. Fifth, a CS and a CI both separately informed Investigator Leitzen that Defendant sold heroin. Based on the foregoing, I find that unlike *Lopez-Zuniga*, there is far more information in the affidavit regarding Defendant's alleged drug trafficking activities than just the information regarding the interactions and relationship between Defendant and McDougal. Thus, based on the totality of the circumstances, I reiterate that there is substantial evidence supporting the magistrate's determination that there was a fair probability that contraband would be found at Defendant's residence and, therefore, probable cause to issue the search warrant.

Defendant and Vandermillen had a short interaction without video evidence of drugs being exchanged. Defendant seems to believe this is similar to *Lopez-Zuniga* and supports his assertion that "innocent activity between a defendant and someone known to be involved in drugs does not create probable cause." In the case at bar, however, the affidavit offers multiple reasons supporting probable cause that Defendant and Vandermillen were involved in a drug deal on January 23, 2023. (Doc. 22-1 at 5.) The affidavit recounts that: (1) Brian Woods had two brief exchanges with Vandermillen, while Vandermillen was inside a gold Jeep, at a gas station; (2) from the gas station, Vandermillen drove to Defendant's residence and parked across the street from

Defendant's residence; (3) an individual matching Defendant's description met with Vandermillen at the Jeep and Defendant leaned into the Jeep and about 30 seconds later left the Jeep, returned to his residence and then left in McDougal's vehicle and went to the Days Inn; (4) following the meeting with Defendant, the Jeep drove to a different gas station on Hill Street, where Brian Woods got into the Jeep; and (5) several minutes later the Jeep left the gas station with Brian Woods in the Jeep and about six minutes after the Jeep left the gas station Brian Woods was "dumped" out of the Jeep and suffered a drug overdose. In the affidavit, Officer Wullweber explained that:

> Based on my training and experience, these circumstances are consistent with a drug deal where the driver of the Jeep, believed to be Michael Vandermillen Jr., is "middling" a drug deal between Brian Woods and the black male subject believed to be [Defendant]. It is believed that the meeting between Woods and the driver of the Jeep at the 32nd Street gas station was them arranging to make the purchase and possibly Woods providing money to the driver of the Jeep. The driver of the Jeep then meets with the drug supplier, believed to be [Defendant], to purchase the heroin for Woods. The driver of the Jeep then meets with Woods to deliver the heroin. It is then believed that Woods used heroin inside the Jeep and suffered an overdose.

(Government Ex. 1 at 13.) Both Officer Wullweber and the magistrate could draw reasonable inferences from the circumstances set forth above to conclude that Defendant and Vandermillen were involved in drug deal on January 23, 2023. *See Brackett*, 846 F.3d at 992 ("Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'") (quoting *Thompson*, 210 F.3d at 860). Furthermore, as set forth above, the affidavit included information that both Defendant and McDougal, were known to law enforcement as drug distributors, and both had criminal drug convictions. Law enforcement had also conducted a controlled drug purchase in the past with

Defendant and in September 2022 Defendant was found with three bags of heroin and drug paraphernalia when searched incident to arrest. Finally, the affidavit provided that a CS and a CI both separately informed Investigator Leitzen that Defendant sold heroin. Thus, based on the foregoing, I find that unlike *Lopez-Zuniga*, there is far more information in the affidavit regarding Defendant's alleged drug trafficking activities than just the information regarding the brief interaction, that could reasonably be inferred to be a drug transaction, between Defendant and Vandermillen on January 23, 2023. Therefore, based on the totality of the circumstances, I again emphasize that the magistrate properly determined that there was a fair probability that contraband would be found at Defendant's residence and the magistrate properly found probable cause to issue the search warrant.

To the extent that Defendant argues that the affidavit lacks probable cause because the traffic cameras never showed him entering or leaving the West 8th Street residence or that the CI stated he lived on Hill Street, not West 8th Street, Defendant's argument is unpersuasive. Government Ex. 3 shows that Defendant's West 8th Street residence is at the intersection/corner of Hill Street. While the traffic camera video does not specifically show Defendant entering or leaving his residence, traffic camera video showed the Jeep parking outside the residence and Defendant going to the Jeep. The traffic camera video also showed, as explained in the affidavit, McDougal's vehicle, driven by both Defendant and McDougal, coming and going from Defendant's residence, generally to-and-from the Days Inn. (Government Ex. 1 at 11.) Furthermore, the affidavit provides that Investigator Leitzen had observed Defendant standing in front of the West 8th Street residence on "numerous occasions." (*Id.* at 10.) The affidavit also provides that on January 23, 2023, Investigator Leitzen observed Defendant leaving his residence on West 8th Street and another officer observed McDougal go into Defendant's residence. (*Id.* at 13-14.) Based on the foregoing, I find that Defendant's argument does

29

not detract from my finding that, based on the totality of the circumstances, the magistrate properly determined that there was a fair probability that contraband would be found at Defendant's residence and the magistrate properly found probable cause to issue the search warrant.

The Government argues that even if the Court finds the warrant lacked probable cause, the *United States v. Leon* good faith exception applies to the warrant. (Doc. 27-1 at 17-21.) Reviewing courts should not suppress evidence seized pursuant to a search warrant, even if the reviewing court determines probable cause was absent, if the officers applying for the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922 (1984). Under this "good-faith exception," if a law enforcement officer's reliance on a warrant so issued was objectively reasonable, the evidence seized pursuant to the invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).

Defendant argues that the *Leon* good faith exception does not apply because "the search warrant to search [Defendant's] residence was obviously lacking." (Doc. 22-1 at 9.) Relying on *United States v. Herron*, 215 F.3d 812 (8th Cir. 2003), Defendant argues that "the affidavit relies almost solely on information about [Defendant's] relationships with known drug users," a single drug related conviction, and "speculation of what occurred during an interaction between the person in the dark-colored coat and the driver of the gold Jeep." (Doc. 22-1 at 9.)

I find the warrant was not so "facially deficient that no police officer could reasonably presume the warrant to be valid" and it was not objectively unreasonable for law enforcement officers to rely on this warrant, which was issued by a neutral judge. *Proell*, 485 F.3d at 430-31.

In determining whether law enforcement's reliance on a warrant was "entirely unreasonable," "[t]he court must look at the objectively ascertainable question of whether

30

a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted). *Leon* explained that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted).

The good-faith exception routinely applies unless there are extreme circumstances which prevent its application. In *United States v. Herron*, for example, the good-faith exception did not apply because although there was no technical legal deficiency in the affidavits, there was "simply no evidence" in the affidavits linking the suspect to criminal activity. 215 F.3d 812, 814 (8th Cir. 2000). That is not the case with the warrant before the Court. The affidavit in this case provided information from a CS and a CI that an individual identified as "E" and known to Investigator Leitzen as Defendant sold heroin. Investigator Leitzen knew Defendant was involved in controlled drug purchase in the past. Law enforcement knew Defendant's residence and its location at the intersection of West 8th Street and Hill Street. Law enforcement observed Defendant outside of the West 8th Street residence and coming and going from that residence on numerous occasions. Defendant was in a relationship with McDougal, a known drug user and drug distributor whose room at the Days Inn contained drugs. Defendant regularly drove McDougal's vehicle, often between his residence and the Days Inn where McDougal was staying. In September 2022, after being searched incident to arrest, Defendant was found in possession of three bags of heroin and drug paraphernalia. Defendant also had a prior drug conviction. Lastly, law enforcement observed via traffic camera video a drug deal between Defendant and Vandermillen outside Defendant's residence. Accordingly, even

if the District Court finds that the warrant violated the Fourth Amendment because it lacked probable cause, I recommend the Court find that officers could reasonably rely on the magistrate's assessment of probable cause under the *Leon* good faith exception.

## V. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 22.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 27th day of July, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa